**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

-vs-	Case No. 6:08-cr-68-Orl-31KRS

**JUAN BAUTISTA-SILVA**

---

**ORDER**

Juan Bautista-Silva ("Bautista-Silva") was transporting illegal aliens on Interstate 95 when he was stopped by agents of the Department of Homeland Security, U.S. Customs and Border Protection (the "Border Patrol"), to whom he confessed. He now moves to suppress that confession and all other evidence resulting from that encounter, arguing that the stop violated the Fourth Amendment to the United States Constitution. (Doc. 25). The Court conducted an evidentiary hearing on the motion on June 10, 2008.

**I.	Background**

At about 11:00 a.m. on March 20, 2008, Border Patrol agents Richard Cole ("Cole") and Sergio Perez ("Perez") were monitoring southbound traffic from northern end of a rest stop on Interstate 95 near mile marker 226 in Brevard County, Florida. Cole testified that he and Perez had been monitoring traffic at that location since approximately 6:30 a.m. The spot was chosen because it was a wide, open area, with no trees, giving agents the ability to observe southbound traffic for a long period before it reached their position.

The agents were in a marked Border Patrol vehicle, with Cole behind the wheel. They spotted a southbound Chevy Suburban – a relatively large SUV – with a California license plate. The van was driven by Bautista-Silva and contained five other Hispanic males – four adults and one juvenile, (although initially Cole could only see the two men in the front well enough to distinguish their gender or ethnicity). In Cole's words, these facts, combined with the size of the Suburban, "kind of stirred my interest," and he decided to pursue it.[1]

According to Cole's testimony, the Suburban did not appear to be speeding or driving erratically as it approached his vehicle from the north, but sped up to approximately 90 miles per hour a short time after it passed. Cole said this made him suspicious, in that "a lot" of smugglers "try to get to the first exit" to attempt to blend in with city traffic and avoid being stopped.[2] Cole could not provide a precise estimate of the top speed to which the Suburban accelerated, but estimated that he was going between 90 and 100 miles per hour to catch up to it.[3] He said that when he did pull up beside the Suburban, it slowed down "very quickly." This also made Cole suspicious. He testified that "it's not uncommon" for smugglers to do that "in an attempt that I pass them and just keep going."

---

[1] Cole also testified that his suspicions were aroused when it appeared that the Suburban, which had been "more or less behind" a particular pickup truck when he first spotted it, "seemed to drift alongside" the truck as it got close to his position, "almost like [it was] trying to block its view using that other truck so I couldn't see it."

[2] This suggests that Agent Cole believed that the Suburban's driver had seen his marked car when it passed Cole's location.

[3] When writing his report, Cole did not include the information about the Suburban appearing to try to hide behind another vehicle as it approached his position or accelerating rapidly after it passed.

After Cole pulled up alongside the Suburban, he spent some time trying to attract the attention of its passengers, but they would not make eye contact or acknowledge the agents.[4] He testified that the occupants appeared nervous to him because they did not acknowledge him or break posture, just continuing to look straight ahead. According to Cole, illegal aliens have "been coached by these smugglers to avoid contact with us at all costs. They won't look at us. They will not respond to us."

Perez radioed in a check of the Suburban's license plate, which came back as registered to a Daniel Maron in California.[5] At this point, with perhaps five minutes elapsed since he first spotted the Suburban, Cole turned on his flashers and pulled the vehicle over. Upon questioning, the Suburban's passengers admitted that they had entered the United States illegally from Mexico. The passengers other than Bautista-Silva were deported shortly thereafter.[6] Bautista-Silva was charged with a violation of 8 U.S.C. § 1324(a)(1)(A)(ii), which prohibits the knowing transport of undocumented aliens for financial gain.

## II.    Standards

Along America's border (or its functional equivalent), the Fourth Amendment's protections against unreasonable searches and seizures do not apply. Any traveler may be stopped and searched at any time "because of national self protection reasonably requiring one entering the country to

---

[4]Cole was vague as to how he and Perez attempted to attract the attention of the occupants of the Suburban, testifying that he lowered the passenger-side window and used "movement" to try to attract their attention.

[5]Cole testified that California is a known staging area for human smuggling.

[6]Bautista-Silva argued that the deportation of the other five passengers deprived him of the opportunity to call them as witnesses in his defense, violating his Fifth and Sixth Amendment rights, but the resolution of the instant motion makes it unnecessary for the Court to address that issue.

identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (internal quotation and citation omitted). Once beyond the border, however, the Fourth Amendment applies to all seizures of suspected illegal aliens, including seizures that involve only a brief detention short of traditional arrest. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

In *Brignoni-Ponce*, the Supreme Court held that when a law enforcement officer's observations lead him to "reasonably suspect" that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. *Id.* at 881. Specifically, the court held that officers on roving patrol may stop vehicles only if they are aware of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* 884. The officer's reasonable suspicion must be based on the totality of the circumstances surrounding the encounter. *Id.* at 885 n. 10.

The *Brignoni-Ponce* Court laid out a number of factors that may be considered in deciding whether there is reasonable suspicion to stop a vehicle, including its proximity to the border, the usual patterns of traffic on the particular road, and the officer's previous experience with alien traffic. *Id.* at 885-86.

> The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion. Aspects of the vehicle itself may justify suspicion. For instance, officers say that certain station wagons, with large compartments for fold-down seats or spare tires, are frequently used for transporting concealed aliens. The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide. The Government also points out that trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress

>and haircut. In all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.

*Id.* at 885 (internal citations omitted). The Court also held that the likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but not enough, standing alone, to justify a stop. *Id*. at 886-87.

**III.   Application**

The Government provides a long list of "specific articulable facts" that, it argues, supported a reasonable suspicion on the part of Agent Cole that the Suburban was involved in smuggling activities. Most are too commonplace to support such a suspicion or to be given meaningful weight in a "totality of the circumstances" analysis. For example, the Government describes Interstate 95 as a "known corridor" for human smuggling, points out that California is one of the most common locales for illegal border crossing, and notes that smugglers like to utilize larger vehicles, such as SUVs, to maximize the number of aliens transported (and the resulting profits). But Interstate 95 is one of the most heavily traveled roads in the state of Florida , if not the entire country. Smugglers undoubtedly use it, but so do millions of other people. And there is nothing in the record to suggest that smugglers use it disproportionately – or that the particular stretch of Interstate 95 where this encounter occurred, more than 1000 miles from the nearest point on the Mexican border, is some sort of "hot spot" for smuggling. So, too, for the fact that Bautista-Silva was driving an SUV with California plates. As counsel for the defense pointed out during the hearing, Florida gets millions of visitors from California every year, and hundreds of thousands of them arrive by car. The sight of an

SUV, van, truck or the like on Interstate 95 with California plates is decidedly unremarkable.[7] These facts, along with the fact that the occupants of the Suburban appeared to be Hispanic, have some relevance, but are not sufficient to justify a stop.

In addition, a number of the factors detailed by the *Brignoni-Ponce* court are either not present here or do not assist the Government's case, starting with Central Florida's lack of proximity to the Mexican border. There is nothing in the record to suggest that the Suburban appeared to be heavily loaded, or that it had an extraordinary number of passengers, or that anyone inside was trying to hide. Cole testified as to the Hispanic appearance of the Suburban's occupants, but he did not say that they were distinctively Mexican or that they appeared to have entered the United States only recently. And the agents were not aware of any other reasons to suspect this particular vehicle, such as an anonymous tip that it was transporting aliens or a report from other agents that it had recently been observed in an area known for illegal border crossings.[8]

---

[7] In addition, it would not be proper to assign much weight to this factor, given that agents are hardly unanimous in their belief that vehicles such as SUVs, trucks and vans are the vehicles of choice for those engaged in smuggling of aliens. *See*, *e.g.*, *United States v. Barron-Cabrera*, 119 F.3d 1454, 1455 (10th Cir. 1997) (Border Patrol agent testified he was suspicious of Ryder rental trucks, such as the one he stopped, because he knew another Border Patrol unit in the state had recently stopped a rental truck filled with either illegal aliens or narcotics); *and United States v. Venzor-Castillo*, 991 F.2d 634, 636 (10th Cir. 1993) (Border Patrol agent testified that alien smugglers often favored large, older model Cadillacs); *and  Nicacio v. I.N.S.*, 595 F.Supp. 19, 23 (D.C. Wash. 1984) (INS agents testified that "'standard model Fords, Plymouths, Chevys 6-8 years old' were considered suspect" in determining whether to perform investigatory stops), *overruled on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

[8] The Court notes that the Cole and Perez had access to the Treasury Enforcement Communications System ("TECS"), a computerized information system that includes Border Patrol records of enforcement interest in particular persons and vehicles. In a recent case before this Court, the agents radioed in a TECS check and quickly learned that the vehicle they were observing had previously been associated with alien smuggling – a fact that tipped the scales in their favor as to the constitutionality of the subsequent stop. *See United States v. Sanchez Morales*, Case No. 6:08-cr-67.

The legality of the stop, then, primarily rests on two factors: the behavior of the vehicle, and the behavior of its occupants. Cole testified that the Suburban (1) appeared to try to hide behind an adjacent pickup truck as it passed his location; (2) accelerated to approximately 90 miles per hour shortly thereafter; and (3) slowed to 60 miles per hour after he caught up to it. Regarding the occupants of the Suburban, Cole testified that they stared straight ahead rather than looking over and noticing or acknowledging him or his marked vehicle, as most travelers do. Cole testified that, based on his many years of experience as a Border Patrol agent, smugglers often engage in these exact behaviors. The Court has no doubt that this is true. The problem is, everyone else engages in these behaviors, too.

On this record, the driving behavior of the Suburban was not remarkable. Cole himself was not certain that the Suburban was attempting to avoid his notice as it first approached him; at most he thought it might have been, in his words, "drifting" behind the pickup truck. Similarly, while Cole could not estimate the Suburban's initial speed, he said it was traveling around the same speed as the other vehicles on the interstate. It *is* remarkable, however, to speed up to 90 miles per hour immediately after passing a law enforcement officer, at least if one is trying to avoid being noticed – that is, unless one is attempting to escape, Cole's proffered explanation for the Suburban's acceleration.

On this score, the Court takes notice of the fact that, according to FDOT's web site – http://www.dot.state.fl.us/TrafficOperations/Operations/exitnumb/i_95.htm – there is an off-ramp about three miles south of the spot where Cole and Perez were sitting when they first saw the

---

Cole offered little explanation as to why he did not find it advisable to utilize this (apparently) powerful tool, except to say he had never gotten into the habit of doing so.

Suburban. Based on Cole's testimony as to the speeds at which the vehicles were traveling and the amount of time it took to catch up from a standing start, Bautista-Silva likely traveled five miles or more after he passed the agents' location. There is no indication in the record that he attempted to exit the highway so as to evade the agents. Moreover, there is a "heads I win, tails you lose" flavor to basing a "reasonable suspicion" on these factors. When the Suburban sped up, that was suspicious behavior; and when the Suburban slowed down, so was that.

The perverse quality of this line of reasoning comes into sharper focus when considered in conjunction with the allegedly suspicious behavior exhibited by the occupants of the Suburban – *i.e.*, their failure to react when the Border Patrol agents pulled alongside. Speed up, slow down, stay the same – all suspicious, all justifying a stop.[9] And just as stoicism in the presence of Border Patrol agents arouses their suspicions, reacting to their presence can lead them to suspect you as well. *See, e.g, United States v. Aldana-Roldan*, 932 F.Supp. 1455, 1458 (S.D. Fla. 1996) (agent based stop in part on seeing occupants of van look at his vehicle with apparent recognition of who he was). Similarly, in a recent case before this Court, the Government sought to justify a stop in part on the grounds that the Border Patrol agent "noticed that the driver and passenger were both Hispanic and that the driver appeared startled when passing [the agent]." (Doc. 35 at 2 in *United States v. Sanchez Morales*, Case No. 6:08-cr-67-GAP-KRS).

In the *Sanchez Morales* case, in an effort to lend a dark significance to the fact that the Defendant had been stopped on Interstate 75, the Government pointed out that Border Patrol agents

---

[9]*See also U.S. v. Escamilla*, 560 F.2d 1229,1233 (5th Cir. 1977) (actions of a defendant in staring straight ahead "cannot weigh in the balance in any way whatsoever" in assessing constitutionality of vehicle stop).

were monitoring that road "because they know that it is used as an entry corridor for illegal aliens being smuggled into central and south Florida after having entered the United States from Mexico to obtain work." (Doc. 35 at 2 in *United States v. Sanchez Morales*, Case No. 6:08-cr-67-GAP-KRS). In the instant case, Agent Cole offered essentially identical testimony in regard to Interstate 95's status as an "entry corridor," adding that, based on his experience, enforcement activities on Interstate 75 are causing some smugglers to avoid that highway in favor of Interstate 95. And if a group of illegals were to be stopped next month on, for example, U.S. 27, the Court would expect to hear the Border Patrol agent testify – entirely truthfully, it should be emphasized – that, in his experience, enforcement activities such as those being conducted on Interstate 75 and Interstate 95 lead some smugglers to avoid them in favor of less-traveled arteries, such as U.S. 27. Tails, you lose ...

## IV.  Conclusion

The suspicion needed to justify a seizure under the Fourth Amendment requires something more than just seeing someone act the way a smuggler acts, at least when honest citizens routinely act the same way. In the instant case, almost all of the facts relied on by the Border Patrol agents in initiating this stop – such as the size of the vehicle, the out-of-state license plates, the location, etc. – were entirely (or almost entirely) neutral, and even when added together did not tend to suggest that the Suburban was engaged in illegal activity. The Suburban's speeding up and slowing down during the course of the encounter is the agents' most significant observation. However, based on Cole's testimony, the Suburban's acceleration and deceleration – unaccompanied by any attempt to exit the highway or take other obviously evasive action – was not sufficiently different from the way others routinely drive on Interstate 95 to warrant suspicion. Indeed, it seems counterintuitive that someone attempting to avoid suspicion would engage in such conduct. Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Dismiss Indictment or, in the Alternative, Suppress Evidence and Request for Evidentiary Hearing (Doc. 25) is **GRANTED IN PART** and **DENIED IN PART**.  To the extent the motion seeks suppression of any statement made by the Defendant on or about March 20, 2008, and all physical evidence obtained as a result of the agents' stop, the motion is **GRANTED**.  In all other respects, the motion is **DENIED.**

**DONE** and **ORDERED** in Chambers in Orlando, Florida on June 19, 2008.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Juan Bautista-Silva